Michael Vincent Kuntz v. Commissioner.
Kuntz v. Commissioner
Docket Nos. 72791, 80727.
United States Tax Court
T.C. Memo 1962-98; 1962 Tax Ct. Memo LEXIS 214; 21 T.C.M. (CCH) 536; T.C.M. (RIA) 62098; April 25, 1962
David H. Isacson, Esq., 370 Lexington Ave., New York, N. Y., for the petitioner. Jules W. Breslow, Esq., for the respondent. TRAIN *216 Memorandum Findings of Fact and Opinion TRAIN, Judge: Respondent determined deficiencies and additions to tax in the amounts and for the years as follows: Additions to Tax
1939 Code
1954 Code
Sec.
Sec.
Year
Deficiency
Sec. 293(b)
294(d)(1)(A)
294(d)(2)
Sec. 6653(b)
1952
$734.43
$367.22
$68.08
$45.39
1953
588.87
294.44
52.33
34.88
1954
481.75
37.39
24.26
$240.88
1955
153.70
76.85
1956
79.62
1957
59.50
The issues for decision are as follows: (1) Whether petitioner understated his income for the years 1952 through 1957; (2) Whether all or part of the deficiencies for the years 1952 through 1955 were due to fraud with intent to evae tax; and (3) Whether petitioner is liable for additions to tax under section 294(d)(1)(A) of the 1939 Code. Findings of Fact The petitioner, Michael Vincent Kuntz (hereinafter sometimes referred to as Kuntz), is an individual who resides in Astoria, New York. For the taxable years 1952 through 1957, petitioner filed his Federal income tax returns with the district director for the Brooklyn district of New York. Since 1946, petitioner has been employed *217 as a banquet waiter at the Statler-Hilton Hotel (hereinafter referred to as the Hotel) in New York City. During most of the years in question, petitioner acted as a captain as well as a waiter. A captain is a waiter who supervises a particular party and the service. Three waiters in the banquet department (sometimes hereinafter referred to as the headwaiters), Joe Agra (hereinafter referred to as Joe), Rayon San Martin (hereinafter referred to as San Martin) and Malachia Cesario (hereinafter referred to as Caesar), jointly and equally supervised the other waiters, the service and the distribution of tips. Joe was actually the headwaiter, but the three treated each other as equals. In the banquet department, when a waiter reported for work each day, he received a pay voucher provided by the hotel from the headwaiters' secretary. The waiter wrote his name, social security number and number of dependents on the pay voucher. At the end of a function at which the waiter worked, the voucher was given to the captain in charge of the function. The captain then inserted the type of affair worked, the amount due the waiter plus any additional amount due for activities such as setting up *218 or cleaning off tables. For each fairly large function, there was a captain in charge. The captain was furnished a floor plan of the room in which a function was held. On this plan he indicated such things as location of the tables, number of guests, waiters' stations, and whether liquor was to be served. At the end of each affair, the captain made out a written report which contained the same information as the restaurant check or bill which went to the patron. Both the report and the check indicated the name of the affair, the amount charged for food and beverage, the number of people served, and a 15 percent gratuity charge. The mathematical computation was made by the captain and verified later by the accounting department of the Hotel. Each check contained a printed number and was supplied by the accounting office to the banquet department. A clerk in the accounting department normally typed in the name of the affair. If the restaurant check was prepared early enough, it was presented to the patron in charge of the function to be signed or initialed. After the captain had filled out the floor plan, the report, the restaurant check and the pay voucher, he took them to the *219 headwaiters' office, which was also called the captain's office. At that time, the captain entered, in what was known as the "gratuity books," the name of the affair, the check number, date, the amount for food and beverage, the names of the waiters and the extra activities they performed, and his own name as captain unless he was given sufficient cash by the patron for his services, in which case he would omit his name. This information was taken by the captain from the check, the report and the pay vouchers. If a waiter had performed extra services which entitled him to a larger share of the gratuity, the captain put a certain symbol after the waiter's name. For example, a black dot after a name meant that the waiter served a table and a half. After the entries were made in the gratuity book, Joe took the reports, pay vouchers, floor plans and checks from the various functions held that day and evening and put them on the maitre d'hotel's or banquet manager's desk. The banquet manager compared the checks with the reports, initialed them and sent the checks to the accounting office for processing. The floor plans and the reports were retained for future reference in the banquet *220 office, and the pay vouchers were sent to the payroll clerk. The same evening or the next day, if necessary, a headwaiter, normally Joe, would make the computation and indicate in the gratuity book the proportionate amount of gratuity each waiter was to receive from the affair at which he had worked. Each waiter received an equal amount unless the captain had indicated by symbol that he had done something extra and deserved a larger share. The same evening that the entries were made in the gratuity book, a headwaiter, normally Joe, would copy into what was known as "the little book" the number of the check, the name of the affair and the amount of gratuities due from each affair. Several times a week one of the headwaiters, normally San Martin, took the little book to the accounting department to collect the gratuities. There he would receive two identical slips of paper called the "waiter's fee," which he would compare with the amount shown in the little book. If they agreed, he would sign one copy and give it back to the accounting department. The other copy he would take to the paymaster, collect the money, and sign for it. The money was then taken down to the headwaiters' office *221 and put in a steel strongbox which was kept under lock and key. Approximately once a week, the waiters were called into the kitchen or another location and the gratuities were distributed to them by a headwaiter, normally Caesar. The waiters' names were called and, if they were present, Caesar put a small red cross on the line or lines in the gratuity book where their name appeared and after the figure which indicated the amount they were to receive. This would show them where to sign their name or place their initials as an indication that they had received their gratuity. The gratuities were paid to the waiters at that time. If a waiter did not appear and had not sent a fellow waiter to collect for him, the money would remain in the strongbox. At the end of a one or two week period, to enable them to balance the books and be sure that the cash on hand was correct, the money due a waiter who had not been around to collect, was put in an envelope and remained in the strongbox until the waiter collected it. Caesar or one of the other headwaiters would then sign his own name in the gratuity books next to the name of the waiter whose money was in the envelope. When all of the money *222 shown on a page had been accounted for, a large red cross was placed on or through the page. The gratuity books were kept locked in a closet or file cabinet in the headwaiters' office except for the book currently in use, which was kept on or in a desk in said office. The office was locked unless in use by the headwaiters. The gratuity books were provided by the hotel and were kept by the headwaiters so that they could keep track of the gratuities due the waiters. The gratuity books did not reflect salary income, as such, that was paid by the Hotel; that is, the gratuity books only indicated the amount of gratuities or tips added to a patron's bill which were not paid in cash. The 15 percent gratuity added to each bill was divided up so that 12 percent went to the waiters and the remaining three percent would be divided up among Joe, San Martin, Caesar, the banquet manager, the captains, barkeepers and certain others the headwaiters felt deserved some money. On very rare occasions a patron refused to pay the 15 percent gratuity charge. On those occasions, the headwaiters would have to refund to the accounting department, out of their 3 percent share of the gratuities, the *223 difference between the 15 percent added to the bill and the amount which the patron actually paid as a gratuity. The 12 percent of the total bill which was previously distributed to the waiters was not affected so that the amounts shown in the gratuity books after each waiter's name were correct and not changed by the patron's refusal to pay a full 15 percent. If the gratuity collected for any affair was insufficient to cover the minimum gratuity a waiter was required to receive, the minimum would be furnished out of the share of the 3 percent going to the headwaiters, which was pooled and divided up weekly. Occasionally, if the affair was small and the gratuity small, the waiters would get the full 15 percent and the headwaiters would forego their 3 percent share. Starting in April 1957, weekly gratuity slips were prepared by acting captains, showing tips paid to each waiter each week. Petitioner prepared some of these slips himself. The waiters signed these slips, which indicated the gratuities they each received, and were given the original for their own records. The information contained thereon was taken from the gratuity books. For approximately a year, from the latter *224 part of 1951 to the latter part of 1952, petitioner served as secretary to the headwaiters. During petitioner's service as a secretary to the headwaiters, his primary job was booking the waiters needed to serve at the various functions, calling the union to hire extra men, and performing bookkeeping jobs. For these services, petitioner would be paid from $10 to $20 per week out of the headwaiters' share of the 3 percent gratuity pool. These payments were not shown in the gratuity books. Occasionally, when the job of secretary would require extra time so that petitioner could not work as a waiter at an affair, a pay voucher would be entered and he would receive from the Hotel the salary of a waiter for that affair. On other occasions when he helped sign the waiters off at the end of an affair, his pay voucher would be marked with a cross to indicate that he should be given additional salary by the Hotel as if he had set up or cleared off tables. As secretary, petitioner would be given preference over other waiters in working various banquet functions. At times, a captain received cash gratuities directly from the patron. These amounts would not be shown in the gratuity books. Occasionally *225 there were "collection parties," such as dances, for which there was no 15 percent gratuity charge. At these functions, patrons would tip the waiters directly. These amounts were paid in cash and were not recorded in the gratuity books. At dances which ran later than 2 a.m. there would be an additional gratuity charge of $5 per waiter. Sometimes this amount would be added to the patron's bill and other times it would be given to the captain in charge who would distribute it to the waiters directly. If distributed directly, it would not be shown on the gratuity books. At times, petitioner requested that he be paid his share of gratuities in between pay periods. On these occasions petitioner would examine the gratuity book and tell the headwaiter how much was due him and was then paid that amount. There was no withholding tax deduction on gratuities and the W-2 form showed only salary and withholding deducted on salary. Petitioner was aware of this fact. The following schedule shows the amount of salary and tips reported by petitioner and also the amount of tips the respondent determined petitioner failed to report: Tips Respondent
Total Income
Tips
Determined Kuntz
Year
Shown on Return
Salary
Reported
Failed to Report
1952
$3,040.58
$2,755.00
$ 285.00
$3,271.25
1953
2,814.29
2,514.29
300.00
2,733.15
1954
2,733.19
2,333.19
400.00
2,597.50
1955
2,759.85
2,059.85
700.00
1,565.84
1956
5,212.41
2,606.41
2,606.00
261.05
1957
5,017.18
2,518.59
2,598.59
251.86
*226 Petitioner was indicted under sections 145(b) and 7201 of the Internal Revenue Codes of 1939 and 1954, respectively, for willful evasion of income tax for the years 1952, 1953 and 1954 for failure to report gratuities in each year in amounts equal to those asserted by the respondent herein in the notice of deficiency. He was found guilty by the jury and sentenced on February 27, 1958. His conviction was upheld by the United States Court of Appeals in October 1958, United States v. Kuntz, 259 F. 2d 871 (C.A. 2, 1958). Petitioner took a commercial course in high school which included bookkeeping. During the years in question, petitioner held a commercial pilot's license. In 1954 or 1955, petitioner took dramatic lessons. At one time, petitioner tried out for an off-Broadway play. All or part of the deficiencies with respect to the years 1952, 1953, 1954 and 1955 are due to fraud with the intent to evade the payment of tax. Opinion Respondent has conceded that petitioner is not liable for the additions to tax under section 294(d)(2) of the 1939 Code. This will be taken into consideration in a Rule 50 computation. The taxable year 1952 is *227 barred by the three-year statute of limitations unless respondent proves fraud for that year. Petitioner signed a waiver extending the statute of limitation for the year 1953. Petitioner contends that the revenue agent procuring the waiver from him coerced him into signing it. After considering the evidence presented on this question, we find petitioner's contention to be without merit. For the taxable years, 1953 through 1957, petitioner has not contested the amount of the unreported income as determined by respondent, nor has he contested the expenses disallowed for 1956 or 1957. To exonerate himself from the deficiencies in question, petitioner contends that the gratuities constituted wages and the Hotel should have withheld taxes on that income. It is petitioner's position that the Hotel was primarily liable for the tax and since the Hotel failed to fulfill its duty this excused the petitioner for his failure to report all his income. There is no merit in petitioner's contention. The same argument was made and rejected in petitioner's criminal case. In United States v. Kuntz, supra, the Court, in discussing petitioner's argument, said: Defendant here vigorously *228 urges that only his employer, the Hotel Statler, is liable for taxes on the gratuity income, since it should have withheld the tax upon it. Nevertheless the trial judge was correct in holding that this case does not involve the withholding sections of the revenue code at all. There is not the slightest evidence that defendant's employer paid the tax due on these gratuities or withheld the amount of the tax from the sums distributed to defendant. In such case the law is clear that, while the Government may pursue the employer for the full amount he should have withheld, [I.R.C. 1954, § 3403 * * *; Treas. Reg. § 31.3403-1; I.R.C. 1939, § 1623; Treas. Reg. § 406.401(c)] the employee must report his entire income, whether subject to withholding tax or not, I.R.C. 1954, § 1462, 26 U.S.C. § 1462; I.R.C. 1939, § 143(d), 26 U.S.C. 143(d), and may claim a credit against the tax due on this sum only in the amount that the employer *229 actually withheld, I.R.C. 1954, § 31(a)(1), 26 U.S.C. § 31(a)(1); I.R.C. 1939, § 35, 26 U.S.C. § 35. We hold that the deficiencies for the years 1953 through 1957 should be sustained. We now turn to the question of whether all or part of the deficiencies for the years 1952 through 1955 were due to fraud with intent to evade tax. The burden of proving fraud is on the respondent. [1] Fraud must be proven by clear and convincing evidence. [2] Respondent must prove that petitioner understated his income and that all or part of such understatement was due to petitioner's fraudulent intent to evade taxes. For the respective years 1952 through 1955, respondent determined that petitioner omitted gratuity income in the amount of $3,271.25; $2,733.15; $2,597.50; [3] and $1,565.84. The evidence shows that petitioner actually omitted amounts in excess of that determined by respondent. *230 The gratuity books substantiate the amounts determined for 1952, 1953 and 1954. For 1955, the gratuity books show that petitioner actually received $2,050.64 rather than $1,565.84 determined by respondent. In addition, petitioner received cash tips which were not included in respondent's determination, nor was the $10 to $20 per week petitioner received for acting as secretary to the headwaiters in 1952. Although he did not argue it on brief, there was some vague testimony by petitioner to the effect that he did not know the gratuities were taxable income. Despite this, petitioner did report some gratuity income every year. Petitioner kept no books and records. Petitioner contended that when he was ready to prepare his tax returns for the years 1952, 1953, 1954 and 1955 he attempted to ascertain the amount of gratuity income he received. Petitioner alleges that when he was denied access to the gratuity books, he discussed a method of estimating such income with his fellow employees. Petitioner alleges that he then adopted the method generally prevalent of adding 10 to 15 percent to the amount shown on the withholding tax statement provided by his employer. We find petitioner's *231 contentions unconvincing. Joe testified that it was not until about 1955 or 1956 that petitioner requested permission to see the old gratuity books. This was at a time after respondent had begun his investigation of petitioner. Joe admitted that petitioner was refused permission to see the books. He stated that the reason was that petitioner wanted to take them outside the Hotel. He also stated that petitioner was free to examine the books to any extent he wanted, so long as the books were not removed from the Hotel. Petitioner testified that in each year, 1953, 1954 and 1955, he tried to examine the books but was refused. We believe Joe's story is the more likely of the two. However, even if we assume that petitioner's version is the correct one, the plain inference is that petitioner knew that this income was taxable and should be reported. At best, petitioner's agruments seem to be groping afterthoughts. As we said in M. Rea Gano, 19 B.T.A. 518, 533 (1930): A failure to report for taxation income unquestionably received, such action being predicated on a patently lame and untenable excuse, would seem to permit of no difference of opinion. It evidences a fraudulent *232 purpose. Furthermore, consistent, substantial understatements of income for several years is persuasive evidence of fraudulent intent. [4]
We hold that all or part of the deficiencies for 1952 through 1955 were due to fraud with intent to evade tax. The deficiency for 1952 is sustained. For the years 1952, 1953 and 1954, respondent determined that petitioner was liable for additions to tax under section 294(d)(1)(A) of the 1939 Code for failure to file declarations of estimated tax. Section 58(a) [5] of the 1939 Code sets forth the general rule as to who must file a declaration of estimated tax. *233 To come within 58(a)(1) petitioner would have to have had a reasonable expectation that he would have gross income of $6,300 in 1952 and 1953 and $6,900 in 1954. As redetermined, his gross income for 1952, 1953 and 1954 was $6,311.83; $5,547.44 and $5,330.69 respectively. The slight excess in 1952 over the statutory figure does not, in our opinion, support the addition under this provision of the statute. To come within section 58(a)(2), petitioner would have had to have income in excess of $100 from sources other than wages and his gross income would have had to exceed $600. Respondent has conceded that the gratuities collected for the waiters by the hotel and dispersed to them constituted "wages." Petitioner testified that he received no other income other than from the Hotel. While petitioner's veracity is doubtful, we find no basis in the record to support the addition under 58(a)(2). Thus, petitioner did not meet either requirement of section 58(a) and was not required to file declarations of estimated tax. Accordingly, we held respondent's determination was erroneous in this respect. Decisions will be entered under Rule 50. Footnotes
1. Section 1112, 1939 Code; section 7454, 1954 Code. ↩
2. M. Rea Gano, 19 B.T.A. 518 (1930); Arlette Coat Co., 14 T.C. 751 (1950); W. A. Shaw, 27 T.C. 561 (1956), affd. 252 F. 2d 681↩ (C.A. 6, 1958).
3. In his reply to respondent's answer, petitioner admitted that he received $3,271.25, $2,733.15, and $2,597.50 from gratuities in the respective years 1952, 1953 and 1954.↩
4. Kurnick v. Commissioner, 232 F. 2d 678 (C.A. 6, 1956); Lillian Kilpatrick, 22 T.C. 446 (1954), affd. 227 F. 2d 240↩ (C.A. 5, 1955).
5. SEC. 58. DECLARATION OF ESTIMATED TAX BY INDIVIDUALS. (a) Requirement of Declaration. - Every individual (other than an estate or trust and other than a nonresident alien with respect to whose wages, as defined in section 1621(a), withholding under Subchapter D of Chapter 9 is not made applicable, but including every alien individual who is a resident of Puerto Rico during the entire taxable year) shall, at the time prescribed in subsection (d), make a declaration of his estimated tax for the taxable year if - (1) his gross income from wages (as defined in section 1621) can reasonably be expected to exceed the sum of $4,500 plus $600 with respect to each exemption provided in section 25(b); or (2) his gross income from sources other than wages (as defined in section 1621) can reasonably be expected to exceed $100 for the taxable year and his gross income to be $600 or more.↩